# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

PAMELA J. BALES,            )
                                          )
             Plaintiff,          )
                                          )
v.                                )     Case No. 10-CV-408-PJC
                                          )
MICHAEL J. ASTRUE, Commissioner of the  )
Social Security Administration,         )
                                          )
             Defendant.       )

## ORDER AND OPINION

Claimant, Pamela J. Bales, ("Bales"),  pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Bales' applications for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Bales appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Bales was not disabled.  For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

## Claimant's Background

On the date of the administrative hearing on April 23, 2008, Bales was 48 years of age. (R.  24, 106).  She had graduated from high school, but she had taken special education classes. (R. 45).  She had previously held various jobs, including jobs through a temporary agency.  (R.

29-36). Her last job was cleaning apartments, and if she hadn't been fired, she could have continued to do that work in 2005. (R. 36). In the summer of 2005, she experienced increased problems, including physical attacks, with her daughter who had mental health issues. (R. 37-38). Since the time period beginning September 1, 2005, both Bales' emotional and physical health had declined, including issues with diabetes, hearing voices, seeing things, and having a hysterectomy caused problems with scarring that led to a hernia. (R. 38-39). She had been diagnosed with bipolar disorder and anxiety or panic attacks. (R. 39-40).

She did not like going outside, and she would only leave the house when she had to, such as going to the grocery store or the laundry. (R. 40). Usually her mother took her to those places. *Id.* She said sometimes she would experience a severe anxiety attack while at a store, and she would have to run out of the store. *Id.* She was nervous at the hearing and said that she would "really like to get out of the room." (R. 46).

Staying in her apartment all day was a normal day for her, and a really bad day was when she did not get dressed. (R. 40). She spent a lot of time on her computer, but she characterized her activities as ones that fit in with her short attention span, moving from one thing that interested her on the Internet to another thing. (R. 40-42). Bales testified that she could not read a newspaper because it would not hold her attention. (R. 42). She no longer read books or magazines, and if she read an article on the Internet, she wouldn't recall it. *Id.* She described being so fatigued or tired that some days she didn't want to eat. (R. 42-43). She didn't want to cook, because she didn't want to do the dishes. (R. 43). She was intimidated by authority figures. (R. 43-44). Her father and her sister thought she was being lazy, but her mother understood and helped her all the time. (R. 44).

Bales testified that one summer she was injured when she was avoiding being hit by her daughter, although she did not realize that she had been injured right away. (R. 44-45). The emergency room doctors prescribed physical therapy for what they said were pulled muscles. (R. 45).

Records show that Bales was treated at the OSU Health Care Center (the "OSU Clinic") from April 2002 through 2008. (R. 223-73, 292-357, 395-421, 607-29). On what appears to be her initial evaluation at the OSU Clinic in April 2002, she was noted to be taking several medications for depression symptoms, and it was noted that she was treated at ACT, which is common abbreviation for Associated Centers for Therapy. (R. 260). Of five assessments by the physician at the April 2002 appointment, two are not legible, and the other three were migraine cephalgia,[1] perimenopause, and depression. *Id.* She was seen for a routine annual check up on August 6, 2002. (R. 256). On October 10, 2002, Bales complained of left heel pain that she thought might be from a bone spur, and she asked for a referral to an eye doctor because she thought her glasses were giving her headaches. (R. 253-54). She was diagnosed with plantar fasciitis. (R. 254). On November 18, 2002, Bales' complaints were continued problems with her left foot and numbness of both hands that she said had worsened in the previous month. (R. 249). The assessments were somatic dysfunction, TOS[2], plantar fasciitis, and carpal tunnel syndrome. *Id.*

Bales was seen at the OSU Clinic again on January 15, 2003. (R. 244-46). While Bales' chief complaint was a sore throat with swollen glands, the physician also recorded that Bales was

---

[1]Cephalgia is a headache. Taber's Cyclopedic Medical Dictionary 349 (17th ed. 1993).

[2]Possibly "thoracic outlet syndrome."

having problems with heartburn, hot flashes, and worsening numbness in her hands. (R. 244). It appears that several issues were discussed, but the hand-written notes are difficult to decipher. (R. 246). Her plantar fasciitis was considered resolved because she had been treated by a podiatrist with cortisone shots. (R. 246-47). The assessments were postnasal drip, somatic dysfunction, and carpal tunnel syndrome. (R. 247). Bales was seen again on March 6, 2003. (R. 242). While the hand-written notes are not completely legible, it appears that Bales continued to complain of hand numbness. *Id.* On April 29, 2003, Bales wanted to discuss her medications to see if she could make them more affordable, and she complained of left ankle swelling. (R. 239). The diagnoses were hypertension, gastroesophageal reflux disease ("GERD"), depression, and symptoms of menopause. *Id.*

At a June 12, 2003 appointment at the OSU Clinic, Bales was assessed with somatic dysfunction of her spine, pelvis, and shoulders. (R. 238). The previous diagnoses of hypertension, GERD, and depression were continued. *Id.* On July 24, 2003, her diagnoses were described as left upper extremity weakness, somatic dysfunction, GERD, and depression, and Bales' hypertension was described as controlled. (R. 237). On July 31, 2003, Bales complained of left shoulder pain, and the assessment was left shoulder impingement syndrome, along with historical symptoms of bilateral carpel tunnel syndrome. (R. 236). The physician advised that she avoid activities with her left arm away from her body. *Id.*

On September 9, 2003, Bales complained of swelling in her hands and feet with increased pain at night and trouble sleeping. (R. 235). The assessments were insomnia, hypertension, and GERD. *Id.* At a follow-up appointment on September 16, 2003, she was diagnosed with clinical hypothyroidism, hypertension, GERD, and improved insomnia. (R. 234). After a pelvic

ultrasound, she returned to the OSU Clinic on October 16, 2003, at which time she was diagnosed with a complex ovarian cyst and perimenopausal symptoms. (R. 233).

The administrative transcript contains records of Bales being seen for psychiatric services at Family & Children's Services ("FCS") beginning November 4, 2003, but the notes of Bryan Touchet, MD indicate that Bales had been seen previously. (R. 565). Bales said that her mood was okay, but she was having trouble going to sleep. *Id.* She had panic attacks one to two times a week, but they weren't "as severe." *Id.* Dr. Touchet said that Bales was alert, with fair grooming, her thoughts were goal-directed, her affect was bright, and she had no suicidal or homicidal ideation. *Id.* His impressions were depression not otherwise specified with a stable mood; panic disorder with decreased symptoms; and anxiety related to stress that impaired her sleep. *Id.* He continued her medications. *Id.*

 At an appointment at the OSU Clinic on November 6, 2003, Bales was assessed with chronic back pain with paresthesia[3] bilaterally in the upper extremities, obesity, and somatic dysfunction of the spine, ribs, and pelvis. (R. 232). Bales had a hysterectomy in November 2003. (R. 201-22).

Bales was seen by Dr. Touchet at FCS on January 6, 2004. (R. 564). Bales reported no panic attacks recently. *Id.* Bales reported trouble sleeping, and Dr. Touchet observed that she looked fatigued. *Id.* She was alert, her affect was bright, no hallucinations were in evidence, and her thoughts were goal directed. *Id.* Dr. Touchet's impressions were depression not otherwise specified with no recurrence noted; sleep problems related to environmental noise; and panic

---

[3]Paresthesia is "sensation of numbness, prickling, or tingling." Taber's Cyclopedic Medical Dictionary 1438 (17th ed. 1993).

disorder with no recent panic attacks. *Id.* On February 17, 2004, Bales reported lower mood with poor motivation for the previous 2-3 weeks that coincided with stress and frustration that Bales felt regarding her daughter. (R. 563). Bales was alert, but her affect was more sad, and she was tearful at times. *Id.* She had excoriated areas on her eyebrows. *Id.* Dr. Touchet's impressions were major depression with increased symptoms and panic disorder with no recent symptoms. *Id.*

Bales returned to the OSU Clinic on February 23, 2004, and was assessed with hypertension, depression, and postmenopausal status. (R. 231).

Bales was seen by Dr. Touchet at FCS on April 6, 2004, and she reported that she could not handle her daughter, she was depressed, she had no motivation, she was sleeping poorly, she had poor memory, she was fatigued, she had an increased appetite, and she wished for death. (R. 562). Dr. Touchet's impressions were major depression with increased symptoms and stress; panic disorder; and grief over daughter. *Id.* He adjusted Bales' medications. *Id.*

At an appointment at the OSU Clinic on April 22, 2004, hypertension and postmenopausal status were again assessed. (R. 230).

At a May 11, 2004 appointment with Dr. Touchet at FCS, Bales again described severe stressors related to her daughter. (R. 561). She was sleeping poorly and was fatigued, but she described her mood as "not down," and her memory was better but not fully recovered. *Id.* She had no wishes for death and no full blown panic attacks. *Id.* Dr. Touchet's impressions were major depression with decreased symptoms, panic, and poor sleep. *Id.* He adjusted Bales' medications. *Id.* On June 22, 2004, Dr. Touchet's impressions were that Bales' depression and panic disorder both had decreased symptoms. (R. 560).

At the OSU Clinic on July 2, 2004, Bales was assessed with hypertension and depression. (R. 228). On July 19, 2004, she presented for follow up of her hypertension, and she also complained of bilateral ankle swelling with pain. (R. 227). She was assessed with edema in both legs, hypertension, anxiety, and depression. (R. 226-27).

At a July 20, 2004 appointment with Dr. Touchet at FCS, Bales reported that she had no significant panic attacks, but felt stress related to her daughter. (R. 557). Dr. Touchet again noted Bales' major depression, but with a note that the symptoms were still responding to treatment. *Id.* He noted her panic disorder with decreased symptoms, and he noted that she had been overly sedated on Vistaril, which he discontinued. *Id.* On August 17, 2004, Bales reported an "aggravated" mood, and she was taking her medications as prescribed with no side effects. (R. 556). Dr. Touchet's impressions were major depression with no clear signs of relapse; panic disorder with symptoms responding to treatment; and stress that affected her attention and temper. *Id.*

At an August 18, 2004, appointment at the OSU Clinic, Bales was again assessed with hypertension, GERD, anxiety, and depression. (R. 225).

Bales saw Dr. Touchet on September 14, 2004, and she reported that she had been out of Lexapro for one week prior to the appointment, during which time she had increased tearfulness and depression. (R. 555). During the week, she had isolated herself to her home. *Id.* Dr. Touchet's impressions were major depression with symptoms related to discontinuance of the Lexapro, and panic disorder with no recurrence. *Id.*

Bales was seen at the OSU Clinic on September 20, 2004 for chest congestion, with shortness of breath and coughing. (R. 224).

At an October 12, 2004 appointment with Dr. Touchet at FCS, his impressions were major depression, recurrent; panic disorder with controlled symptoms; and troubled sleep. (R. 554). On November 9, 2004, Dr. Touchet's impressions were major depression and panic disorder, and he questioned whether Bales had a sleep disorder or insomnia. (R. 553).

Bales was seen at the OSU Clinic for a routine annual checkup on November 23, 2004 and was assessed with chronic headaches, GERD, and hypertension. (R. 315-16). In December, Bales was seen again and assessed with depression, anxiety, chronic tension headaches, and GERD. (R. 314).

On December 7, 2004, Bales saw Dr. Touchet at FCS, and she reported that she had been experiencing auditory hallucinations. (R. 552). Dr. Touchet's impressions were major depression, panic disorder, and stress-related auditory hallucinations, with a note to rule out Axis II[4] Cluster B.[5] *Id.* On January 18, 2005, Bales reported that she had a "nerve rash" because she was nervous about her daughter returning home, and Dr. Touchet noted excoriated areas on her forearms. (R. 548). Bales said that her mood was okay, her sleep was good, and she denied panic attacks or hallucinations. *Id.* On February 15, 2005, Bales reported that she was more angry and frustrated with her children than she was depressed. (R. 528). Dr. Touchet adjusted her medications. *Id.* On March 15, 2005, Bales reported that she had hit a "low" in her mood. (R. 525). Her sleep and energy were poor, and she had experienced suicidal ideation. *Id.* Dr.

---

[4]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereafter "DSM IV").

[5]Cluster B personality disorders include antisocial, borderline, histrionic, and narcissistic personality disorders. "Individuals with these disorders often appear dramatic, emotional, or erratic." DSM IV at 685.

Touchet again adjusted Bales' medications. *Id.*

Bales was seen in March 2005 at the OSU Clinic at which time she complained of fatigue and insomnia. (R. 312). She was assessed with fatigue, insomnia, depression, and anxiety. (R. 313). In April 2005, Bales again complained of sleep issues. (R. 310). The diagnoses were the same as in March, and she was referred for a sleep study. (R. 311).

Bales saw Dr. Touchet on April 19, 2005, and she reported that her sleep was still not good, but she had improved mood, increased socializing, and good energy. (R. 524). Dr. Touchet continued Bales' medications. *Id.* On June 13, 2005, Bales reported that her mood was great, even though she had ongoing trouble with her son and daughter-in-law and she continued with troubled sleeping. (R. 513). On July 25, 2005, Bales reported that her mood was up and down, she was under stress related to her children, she experienced auditory and visual hallucinations, and she felt fatigued without the ability to go to sleep. (R. 502). Dr. Touchet adjusted her medications. *Id.* On August 29, 2005, Bales reported that she had experienced swelling on a medication, which she discontinued. (R. 492). She had felt more aggravated, distractible, and fidgety for the previous week. *Id.* Dr. Touchet's diagnosis changed to bipolar I disorder and panic disorder. *Id.*

Bales saw Dr. Touchet at FCS on September 20, 2005, and reported that a new medication was too sedating. (R. 489). She was feeling calmer, although she was feeling a bit depressed because her car did not run, but she denied significant depression. *Id.* She was sleeping fairly well. *Id.* Dr. Touchet's impressions were bipolar I disorder most recent episode manic and panic disorder. *Id.* On October 18, 2005, Bales said that she felt better, with a better attention span, and she was less fidgety and distractible. (R. 487). She reported no panic attacks

and no side effects to her medications. *Id.* Dr. Touchet's impression was bipolar I disorder most recent episode manic in full remission, and panic disorder. *Id.*

Bales was seen at the OSU Clinic in November 2005. (R. 305-06). She returned on November 8, 2005 to review lab results, and she was assessed with prediabetes, high cholesterol, high blood pressure, and hypothyroidism. (R. 303-04). On November 22, 2005, Bales had no new complaints and said that she was having no problems with her medications. (R. 301-02).

On November 29, 2005, Bales saw Dr. Touchet at FCS, and reported that she had been caring for two grandchildren recently and she was stressed and frustrated. (R. 484). She had experienced panic attacks that she was able to control behaviorally. *Id.* Her ability to concentrate and to sleep was good. *Id.* Dr. Touchet's impressions remained the same. *Id.* On January 10, 2006, Bales reported sadness because her daughter was not at home, and her grandchildren were with their father. (R. 480). She had some sleep disturbances, but her concentration was good. *Id.* She had a night-time panic attack recently. *Id.* She felt that she could not face the stress of returning to work due to her anxiety. *Id.* She hadn't been able to maintain a housekeeping job in the past year because she couldn't keep up with the policies and she bent the rules. *Id.* Dr. Touchet's impression was bipolar I disorder, most recent episode depressed, moderate, and panic disorder. *Id.* He adjusted Bales' medications. *Id.*

On January 17, 2006, Bales returned to the OSU Clinic and complained of tingling in her hands. (R. 299). She was again diagnosed with prediabetes, high cholesterol, and hypothyroidism. (R. 300). The doctor noted that Bales was counseled on her need to follow a healthy diet and exercise. *Id.* She was seen for follow up on January 31, 2006, and she was assessed with controlled hypertension, prediabetes, high triglycerides, hypothyroidism, and

anxiety. (R. 297-98).

The administrative transcript contains pieces of a treatment plan from FCS dated and signed February 2006. (R. 534-44). The Axis I diagnoses were bipolar I most recent episode depressed; panic disorder without agoraphobia; anxiety disorder not otherwise specified; and major depression disorder recurring severe. (R. 542). Her global assessment of functioning ("GAF")[6] was listed as 54. (R. 544).

On March 29, 2006, Bales presented to the OSU Clinic with swelling, pain, tenderness, and tingling in her legs. (R. 295). Bales cried during the examination and stated that she was losing her housing and living with her parents. *Id.* She was diagnosed with edema, leg pain, numbness, tingling, prediabetes, hypothyroidism, panic attacks, and anxiety. (R. 296).

Bales saw Dr. Touchet at FCS on April 4, 2006, and said that she lost her home and was living with her mother. (R. 472). Bales reported that she was having more panic attacks and having trouble leaving her house unaccompanied. *Id.* She had trouble sleeping, and she reported some auditory and visual hallucinations. *Id.* Dr. Touchet changed his impressions to bipolar I disorder most recent episode depressed, severe, with psychotic features, and panic attacks with agoraphobia. *Id.* He adjusted Bales' medications. *Id.* On May 2, 2006, Bales reported that she

---

[6]The GAF score represents Axis V of a Multiaxial Assessment system. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 32-36 (4th rev. ed. 2000). A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

was trying to find a new place to live, and she was feeling unwanted at her mother's home. (R. 464). She discontinued Seroquel because she felt overly sedated. *Id.* She was not sleeping well, and she had racing thoughts. *Id.* She had low mood and motivation. *Id.* She had anxiety, with tremors and shakes, and she avoided leaving her home. *Id.* She had experienced some suicidal ideation before the appointment, and she was having auditory and visual hallucinations. *Id.* Dr. Touchet changed his impressions to bipolar I disorder, most recent episode mixed, severe, with psychotic features, and panic disorder with agoraphobia. *Id.* He stated that Bales' anxiety was severe and not adequately controlled, and he noted her housing issues. *Id.* He adjusted Bales' medications. *Id.*

At an appointment at the OSU Clinic on May 10, 2006, Bales was diagnosed with depression, anxiety, hypothyroidism, and metabolic syndrome. (R. 293-94).

Bales followed up with Dr. Touchet on May 23, 2006. (R. 460). His impressions remained the same, but he analyzed her risk of suicide because she had told him that she had prepared a suicide note. *Id.* He again adjusted Bales' medications. *Id.* On June 13, 2006, Bales had discontinued two medications because they were too sedating. (R. 449). She reported that her panic attacks were worse. *Id.* Dr. Touchet's impressions remained as bipolar I disorder, most recent episode mixed, severe, with psychotic features, and panic disorder with agoraphobia. *Id.* Bales saw Dr. Touchet again on June 20, 2006 and reported that she was moving to a new apartment. (R. 434). While she felt less stressed and more calm, she continued to have anxiety that was severe enough to make it difficult for her to leave the house. *Id.* In his impressions, Dr. Touchet kept his bipolar diagnosis the same, but noted that Bales was improving. *Id.*

Bales returned to the OSU Clinic on June 20, 2006 for lab work and a referral for removal

of a mole on her right shoulder. (R. 408-09). Impressions were metabolic syndrome and moles, and she was to continue on her current medications. (R. 409). In July, she returned for her laboratory results and because she had tingling of her left arm. (R. 406-07). It was noted that she had bilateral leg edema. (R. 406). Impressions were diabetes II, hypertension, and left medial epicondylitis.[7] (R. 407). At a follow up appointment on August 3, 2006, Bales complained that she had worsening of her left elbow pain, and she complained of episodes of chest pain. (R. 404-05). An irregular heart rate with an EKG showing atrial fibrillation was noted on the physical examination. (R. 404). Her tender left elbow was also noted. *Id.* The impressions included new onset of atrial fibrillation, left lateral epicondylitis,[8] and controlled hypertension and diabetes II. (R. 405). She was given an injection to her left elbow. At a subsequent appointment, Bales had apparently been to the hospital with her chest and elbow pain, and she had been at a psychiatric appointment the day earlier, at which time her medications were adjusted. (R. 402-03). Impressions were follow up of hospital visit for chest pain, anxiety, GERD, and left elbow lateral epicondylitis. (R. 403). She was given diabetes self management training in August 2006. (R. 401). At a well woman check up on August 17, 2006, Bales continued to complain of left elbow pain. (R. 399-400).

The administrative transcript contains pieces of a Treatment Plan from FCS dated August 2006 without any signatures. (R. 435-46). The Axis I diagnoses on this treatment plan were bipolar I disorder most recent episode mixed, severe, with psychotic features, and panic disorder without agoraphobia. (R. 442). Bales' GAF was stated as 54. (R. 444).

---

[7]Golfer's elbow. Taber's Cyclopedic Medical Dictionary 857 (17th ed. 1993).

[8]Tennis elbow. Taber's Cyclopedic Medical Dictionary 857 (17th ed. 1993).

Bales saw Dr. Touchet on September 12, 2006, and she reported that she wanted to change her medications to try to help her anxiety. (R. 426). She felt depressed and found it hard to get out of bed. *Id.* Dr. Touchet's impressions remained as bipolar I disorder, most recent episode mixed, severe, with psychotic features, and panic disorder with agoraphobia. *Id.* Dr. Touchet adjusted Bales' medications. *Id.*

At an appointment at the OSU Clinic on September 19, 2006, the impressions were chest pain most likely secondary to anxiety and GERD; anxiety; GERD; hot flashes, and a fifth item that is not legible. (R. 397-98).

Bales saw Dr. Touchet on October 10, 2006, and reported that she had no side effects to her medications, and she was sleeping well. (R. 424). She still avoided going out, and she had some trouble with low mood, low motivation, and low interests, but she did not have any panic attacks. *Id.* Dr. Touchet's impressions remained the same, and he adjusted Bales' medications. *Id.* On November 7, 2006, Bales reported that she was making an effort to get out more, but was still experiencing anxiety when she did go out. (R. 422). Dr. Touchet changed his impressions to bipolar I disorder, most recent episode mixed, in partial remission, and panic disorder with agoraphobia. *Id.*

Bales saw Dr. Touchet at FCS on January 16, 2007, and she reported that her motivation was poor, she was having trouble sleeping, she was fatigued, she was depressed, and she had little interest in activities. (R. 569). Dr. Touchet changed his diagnosis to bipolar I disorder, most recent episode depressed, severe, with psychotic features, and panic disorder with agoraphobia. *Id.* He adjusted Bales' medications. *Id.*

On January 30, 2007, Bales reported to the OSU Clinic that she had been out of some

14

medications and needed her medications changed so that she could afford them. (R. 624-25). The diagnoses were hypothyroid, diabetes, and post-menopausal status. *Id.*

At a FCS appointment on February 13, 2007, Bales reported increasing panic, along with her low mood and motivation. (R. 601). Dr. Touchet's impressions were the same, and he adjusted Bales' medications. *Id.* On February 27, 2007, Bales was sleeping more than usual and had poor motivation, but was not having full blown panic attacks. (R. 600). Dr. Touchet changed his diagnosis to bipolar I disorder most recent episode depressed, moderate, and panic disorder with agoraphobia. *Id.* He continued Bales' medications as prescribed. *Id.*

On April 4, 2007, Bales again presented to the OSU Clinic stating that she had run out of some medications and asking to switch medication assistance programs. (R. 622-23). She also complained of insomnia. *Id.* The physical examination appears to have found edema in her extremities, but the hand-written note is not clear. (R. 622). The examination also notes a flat affect. *Id.* Impressions were hypertension, hypothyroidism, and insomnia. (R. 623).

Bales saw Dr. Touchet on April 24, 2007, and she reported trouble getting to sleep. (R. 598). Her panic attacks were not as bad. *Id.* Dr. Touchet changed his diagnosis to bipolar I disorder most recent episode depressed, in partial remission, and panic disorder with agoraphobia. *Id.* He adjusted Bales' medications. *Id.* On May 22, 2007, Bales reported general anxiety, rather than panic attacks. (R. 597). Dr. Touchet kept Bales' medications as prescribed. *Id.* On June 19, 2007, Bales described continuing anxiety and panic episodes. (R. 596). Dr. Touchet changed his diagnosis to bipolar I disorder most recent episode depressed, in full remission, and panic disorder with agoraphobia. *Id.* He noted that Bales had "significant anxiety that is interfering with getting out and could interfere with work." *Id.*

On July 17, 2007, Bales reported that she was able to go grocery shopping and to do her laundry. (R. 594). She said that she found it difficult to consider going back to work because she would then have a panic attack, and she reported that she had some panic attacks "out of the blue." *Id.* Dr. Touchet kept his impressions the same, although he changes his note to say that Bales had "significant impairment due to anxiety fueled by stressors in relationship with daughter and by neighborhood." *Id.* On August 14, 2007, Dr. Touchet continued his same diagnoses and kept Bales' medications the same. (R. 593).

Bales presented to the OSU Clinic on September 18, 2007 for medication refills, with no complaints. (R. 618, 621). The notes appear to state that Bales did not do at-home testing of her diabetes because she could not afford the strips. (R. 618). The impressions were diabetes, hypertension, vasomotor[9] symptoms, hypothyroid, and one additional item that is not legible, but which might be hyperlipidemia. (R. 621).

At a September 25, 2007 appointment at FCS, Bales reported conflict with her daughter. (R. 592). Dr. Touchet gave several possible diagnoses related to bipolar I disorder, and he continued the diagnosis of panic disorder with agoraphobia. *Id.* On October 30, 2007, Bales was continuing to have stress from her relationship with her daughter, and Dr. Touchet continued the alternative diagnoses related to bipolar I disorder. (R. 590). On December 4, 2007, Bales reported more stress in her household, including physical abuse from her daughter. (R. 588). Dr. Touchet's diagnoses were bipolar I disorder most recent episode depressed, severe, with psychotic features, and panic disorder with agoraphobia. *Id.* Bales again reported conflict on

---

[9]Vasomotor pertains "to the nerves having muscular control of the blood vessel walls." Taber's Cyclopedic Medical Dictionary 2114-15 (17th ed. 1993).

January 8, 2008, and Dr. Touchet gave alternative bipolar I disorder diagnoses. (R. 586).

Bales reported to the OSU Clinic on January 15, 2008, with several complaints including white spots in vision, bulging at her hysterectomy site, and shaking of her hands. (R. 612-13). Some of the general notes of the physical examination are not legible, but one note stated that her pupils were dilated. (R. 612). The examination noted the bulging at her vertical incision along with tenderness. *Id.* Pitting edema of her extremities and flat, detached affect were noted. *Id.* The impressions were hypoglycemia, malaise/fatigue, diabetes, hypothyroidism, and incisional hernia. (R. 613).

Bales returned to the OSU Clinic on February 19, 2008, and increased blood pressure was noted. (R. 609-10). A mild incisional bulge was noted. (R. 609). Impressions were hypothyroid, diabetes, and incisional hernia. (R. 610).

On March 4, 2008, Bales saw another provider at FCS who continued the diagnoses of bipolar I disorder most recent episode depressed, severe, with psychotic features, and panic disorder with agoraphobia. (R. 583). The administrative transcript also contains an unsigned treatment plan dated March 4, 2008. (R. 574-82). The treatment plan listed Bales' diagnoses as bipolar I disorder, most recent episode depressed, moderate, and panic disorder with agoraphobia. (R. 581). Bales' GAF was given as 55. (R. 582).

Bales presented to the OSU Clinic on March 25, 2008 for follow up after an emergency room visit due to back strain. (R. 607). Physical examination noted the incisional hernia, and pitting edema of the extremities, with left greater than right. *Id.* Notes of the musculoskeletal examination were made, but they are not completely legible. *Id.* It appears that there was tenderness on the right side of the mid thoracic spine. *Id.* Impressions were back strain, diabetes

mellitus II, hypertension, bipolar disorder, and hypothyroid. (R. 608).

Bales saw Dr. Touchet at FCS on April 1, 2008, and she reported that her daughter was living in a group home and that there was ongoing violence in Bales' neighborhood. (R. 573). Dr. Touchet continued the diagnoses of bipolar I disorder most recent episode depressed, severe, with psychotic features, and panic disorder with agoraphobia. *Id.*

Dr. Touchet completed a disability Mental Status Form on November 3, 2004. (R. 274). On this form, he stated that Bales was oriented and had minimal difficulty with concentration. *Id.* He indicated that she had stressors with her family. *Id.* His opinion was that Bales was able to comprehend and carry out simple instructions, but Dr. Touchet stated that he was unable to give an opinion regarding complex instructions or whether Bales could handle pressure in a work situation. *Id.* His diagnoses were major depressive disorder, recurrent, moderate, and panic disorder. *Id.*

Agency nonexamining consultant Dr. Smallwood completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on December 3, 2004. (R. 275-91). For Listing 12.04, Dr. Smallwood noted Bales' depressive syndrome. (R. 281). For Listing 12.06, Dr. Smallwood noted Bales' recurrent severe panic attacks. (R. 283). For the "Paragraph B Criteria,"[10] Dr. Smallwood found that Bales had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties

---

[10]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 288). In the "Consultant's Notes" portion of the form, Dr. Smallwood briefly summarized the November 3, 2004 Mental Status Form completed by Dr. Touchet. (R. 290).

In his Mental Residual Functional Capacity Assessment, Dr. Smallwood found that Bales was moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. 275). Dr. Smallwood also found Bales to be moderately limited in her ability to maintain attention and concentration for extended periods and in her ability to interact appropriately with the general public. (R. 275-76). He found no other significant limitations. *Id*. Dr. Smallwood stated that Bales could understand remember and carry out simple "and possibly some more complex instructions under routine supervision." (R. 277). Bales could relate to co-workers and supervisors "in an incidental fashion." *Id.*

On June 13, 2006, Dr. Touchet completed a second Mental Status Form. (R. 358). The copy included in the administrative transcript is difficult to read. *Id.* Bales' issues with panic attacks and with occasional hallucinations were noted. *Id.* In response to the form's question, Dr. Touchet's response was that Bales might "have moderate difficulty with instructions due to inability to concentrate for long periods of time." *Id.* He also stated that Bales had "moderate impairment [with] work pressure due to anxiety." *Id.*

Bales was seen for a psychological evaluation by agency examining consultant Minor W. Gordon, Ph.D. on July 17, 2006. (R. 359-62). Bales cried during the examination and said that her chief reason for disability was that she could not be around people whom she didn't know. (R. 359). She reported to Dr. Gordon that she stayed in her apartment, and if she shopped, she would usually have her mother accompany her. *Id.* Based on his examination, Dr. Gordon

believed that Bales was suffering from a mild to moderate level of both depression and anxiety "which alone should not preclude her from gainful employment." (R. 360). His opinion was that Bales had difficult communicating comfortably in a social circumstance due to her anxiety. *Id.* He believed that she "should be able to perform some type of routine and repetitive task on a regular basis." *Id.* His Axis I diagnosis was adjustment disorder with features of anxiety and depression, mild to moderate, and he stated her GAF as 65. (R. 361).

A second set of the Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment form was completed by agency nonexamining consultant Burnard Pearce, Ph.D. on August 16, 2006. (R. 369-86). Dr. Pearce again noted Bales depression and anxiety. (R. 372, 374). For the Paragraph B Criteria, as Dr. Smallwood had done, Dr. Pearce found that Bales had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 379). In the "Consultant's Notes" portion of the form, Dr. Pearce briefly summarized the consultative examination of Dr. Gordon. (R. 381). For the Mental Residual Functional Capacity Assessment, Dr. Pearce found that Bales was moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. 383). He found that she was markedly limited in her ability to interact appropriately with the general public. (R. 384). He said that Bales could perform simple and some complex tasks, could relate to others on a superficial work basis, and could adapt to a work situation. (R. 385).

Agency examining consultant Sri K. Reddy, M.D. saw Bales on July 13, 2006 for a physical examination, which was essentially normal. (R. 363-64). Dr. Reddy's impressions were hypertension; diabetes; migraine headaches; uterine cancer, with a hysterectomy in 2004; and

anxiety and depression.  (R. 364).

On August 17, 2006 agency nonexamining consultant Thurma Fiegel, M.D. completed a Physical Residual Functional Capacity Assessment.  (R. 387-94).  For exertional limitations, Dr. Fiegel found that Bales could perform medium work.  (R. 388).  In the space for narrative explanation, Dr. Fiegel summarized Bales' medical history and her normal examination by Dr. Reddy.  *Id.*  Dr. Fiegel found no other limitations.  (R.  389-94).

On May 27, 2008, Dr. Touchet completed a form titled "Mental Impairment Questionnaire."[11]  (R. 633-35).  He gave Bales' diagnoses as bipolar I disorder, most recent episode depressed, moderate, and panic disorder with agoraphobia, and he gave her GAF as 55.  (R. 633).   He checked boxes indicating that her symptoms were sleep disturbance, mood disturbance, delusions or hallucinations, recurrent panic attacks, pervasive loss of interests, and social withdrawal or isolation.  *Id.*  He indicated that Bales was not a malingerer.  *Id.*  Dr. Touchet gave an opinion that Bales' impairments would cause her to be absent from work more than three times a month.  (R. 634).  Dr. Touchet also believed that Bales would have difficult working at a regular job on a sustained basis because her depression and anxiety caused significant social isolation that made leaving the house without a companion difficult.  (R. 635).  Dr. Touchet's opinion was that Bales had marked limitations in her activities of daily living, and extreme limitations in maintaining social functioning.  *Id.*  He thought she had frequent deficiencies of concentration, persistence, or pace.  *Id.*

_____

[11]While this form was dated 3 days before the date of the ALJ's decision, this form was not submitted to the ALJ, but was presented to the Appeals Council after the ALJ had made her decision.  (R. 5).

## Procedural History

Bales filed applications on May 21, 2006 seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*. (R. 106-13). Bales alleged onset of disability as December 4, 2004. (R. 106). Both of Bales' applications were denied in their entirety initially and on reconsideration. (R. 60-72, 74-79). A hearing before ALJ Deborah L. Rose was held on April 23, 2008 in Tulsa, Oklahoma. (R. 24-52). At the commencement of the hearing, Bales amended her onset date to September 1, 2005. (R. 27-29). By decision dated May 30, 2008, the ALJ found that Bales was not disabled at any time through the date of the decision. (R. 16-23). On April 28, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[12] *See also Williams*

---

[12]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe

*v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the Agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

(Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

**Decision of the Administrative Law Judge**

The ALJ found that Bales' date last insured was June 30, 2006. (R. 18). At Step One, the ALJ found that Bales had not engaged in any substantial gainful activity since her amended onset date of September 1, 2005. *Id.* At Step Two, the ALJ found that Bales had severe impairments of bipolar disorder, anxiety disorder, diabetes mellitus, obesity, hernia, and prior hysterectomy. *Id.* At Step Three, the ALJ found that Bales' impairments did not meet a Listing. (R. 19-20).

The ALJ determined that Bales had the RFC to lift or carry 50 pounds occasionally and 25 pounds frequently. (R. 20). She also found moderate limitations on Bales' "ability to follow instructions due to an inability to concentrate for long periods" and her "ability to handle work pressure due to anxiety." (R. 20-21). At Step Four, the ALJ found that Bales could return to her past relevant work as a housekeeper, production worker, or temporary service worker. (R. 23). Therefore, the ALJ found that Bales was not disabled from her amended onset date of September 1, 2005 through the date of the decision. *Id.*

**Review**

Bales makes several arguments in asserting that the ALJ committed reversible error. Because the Court agrees with Bales' argument that the ALJ did not adequately discuss the opinion evidence and that this failure requires reversal, Bales' other arguments are not addressed.

It is oft-stated law in this circuit that an ALJ must discuss more than just the evidence favorable to an opinion that a claimant is not disabled:

> [I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). It is error to ignore evidence that would

support a finding of disability while highlighting the evidence that favors a finding of nondisability. *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007). A bare conclusion, without discussion, is beyond meaningful judicial review, and therefore an ALJ is required to discuss the evidence and give reasons for his conclusions. *Clifton*, 79 F.3d at 1009.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.*

Here, the ALJ discussed the two Mental Status Forms that Bales' treating physician Dr. Touchet completed in 2004 and 2006. (R. 22, 274, 358). These forms are pre-printed by the Oklahoma Disability Determination Division, and they are one page with eight different areas on which the physician is asked to comment. (R. 274, 358). Thus, treating physicians who are presented by this form are not asked the array of detailed functional analysis opinions that are requested in the more detailed Mental Residual Functional Capacity Assessment form that the agency nonexamining consultants complete. (R. 275-77, 383-86). The Mental Residual

Functional Capacity Assessment form asks the consultants to give their opinions on 20 separate functional criteria. *Id.* Thus, by definition, the opinions of Dr. Touchet on the two forms which he completed were going to be less comprehensive than the opinions of the nonexamining consultants.

Given the limitations of the form presented to Dr. Touchet, the ALJ should not have limited her review simply to those two forms, which is what she did. (R. 21-23). The Social Security regulations state that the Commissioner will consider all of the relevant evidence "to obtain a longitudinal picture of your overall degree of functional limitation." 20 C.F.R. § 404.1520a(c)(1). Here, by only looking at the two forms completed by Dr. Touchet, the forms completely by nonexamining consultant Dr. Smallwood, and the mental status examination of Dr. Gordon, the ALJ failed to review and discuss the relevant opinion evidence to obtain a longitudinal picture of Bales' functioning.

Bales complains that the ALJ cited to Dr. Gordon's GAF assessment of 65, but did not mention the various GAF assessments Bales received at FCS of 54 or 55, given in three treatment plans in 2006 and 2008. (R. 22, 361, 444, 544, 582). The undersigned agrees that the ALJ should have recounted the GAF scores that Bales received in her treatment by Dr. Touchet at FCS. If the GAF score given by Dr. Gordon was relevant enough to discuss and cite in support of her RFC, then the GAF determinations of Dr. Touchet were similarly relevant and were required to be discussed and cited. The Tenth Circuit has said that GAF scores are opinions of treating physicians that are required to be analyzed by the ALJ. *Givens v. Astrue*, 251 Fed. Appx. 561, 567 (10th Cir. 2007) (unpublished) (*citing Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). *See also Langley,* 373 F.3d at 1122-23 (GAF scores of 53 and 50 indicated moderate

and serious symptoms, and needed to be included in analysis of opinion evidence).

Additionally, the undersigned finds the lack of discussion of the evidence that Bales saw Dr. Touchet faithfully several times a year from 2004 through 2008 to be troubling. For example, on June 19, 2007, Dr. Touchet said that Bales was "having significant anxiety that is interfering with getting out and could interfere with work." (R. 596). There are more than 100 pages of treating records from FCS, but the ALJ limited her discussion to the two forms completed by Dr. Touchet, and that discussion does not fulfill her obligation to "obtain a longitudinal picture" of Bales' functioning.

Additionally, Bales complains that the ALJ does not completely discuss the opinions of the nonexamining consulting examiners or explain what weight she gave to those opinions. Generally, the evidence of a nonexamining consultant is given less weight than evidence from other sources. *Robinson*, 366 F.3d at 1084. However, even nonexamining consultant opinion evidence must be weighed and explained when the opinions are conflicting. *Shubargo v. Barnhart,* 161 Fed. Appx. 748, 753-54 (10th Cir. 2005) (unpublished). In *Shubargo*, there were several nonexamining opinions, and most of them said that the claimant could do light work, but one opinion said that the claimant could only do sedentary work. *Id.* In his RFC determination, the ALJ found that the claimant could do light work, but he did not explain why he rejected the nonexamining opinion that the claimant could only do sedentary work in favor of the other opinions. The Tenth Circuit found that the case had to be remanded to allow the ALJ to make this explanation. *Id. See also Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (ALJ's rejection of consulting examiner's opinion evidence by including some restrictions and excluding others required explanation); *Kerwin v. Astrue*, 244 Fed. Appx. 880, 884-85 (10th Cir. 2007)

(unpublished) (ALJ's unexplained failure to include handling, fingering, and walking limitations found in consulting examiner's opinion required reversal).

Here, it appears that the non-exertional restrictions that the ALJ included in her RFC determination were based on the 2006 Mental Status Form completed by Dr. Touchet, because the wording is extremely similar:

> [Bales] has moderate limitation on her ability to follow instructions due to an inability to concentrate for long periods. There is another moderate limitation on her ability to handle work pressure due to anxiety.

(R. 21, 358). The ALJ recounted Dr. Smallwood's opinion evidence that Bales had a moderate restriction of her ability to interact appropriately with the public, but she did not discuss if she considered her RFC determination to address this moderate limitation found by Dr. Smallwood. (R. 21-23). At the end of her discussion, the ALJ said that the mental components of her RFC were "supported by the analyses of Drs. Gordon and Touchet." She then said that Dr. Touchet's opinions were "not inconsistent" with the opinions of the agency consultant, and she cited to Exhibits 11F and 12F, which were the forms completed by Dr. Pearce. (R. 23). Other than this one sentence citing to Dr. Pearce's forms, she never discussed Dr. Pearce's opinions, including his finding that Bales was markedly limited in her ability to interact appropriately with the general public. (R. 384). Because the ALJ did not discuss this marked limitation, this Court cannot know why the ALJ did not include any reference to Bales' difficulty with interaction with the public in her RFC determination. A discussion of this opinion evidence, and an explanation of why the ALJ did not include any reference to interaction with the public in the RFC determination, were required. A remand is necessary for the ALJ to have the opportunity to make this explanation.

The Court has found it unnecessary to consider the Mental Impairment Questionnaire

completed by Dr. Touchet in 2008 in this order, but notes that the questionnaire is now part of the record, and must be considered by the ALJ on remand. *See Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004). Similarly, because the error of the ALJ related to the opinion evidence requires reversal, the undersigned does not address the other contentions raised by Bales. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Bales.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

### Conclusion

Based on the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Bales for further proceedings consistent with this Order.

Dated this 22nd day of June, 2011.

Paul J. Cleary
United States Magistrate Judge